RICHARD WORTHINGTON *vs.* HENRY O. HOUGHTON & others

In an action for libel the defendants demurred, assigning for cause that the declaration did not set forth anything which was by its natural import libellous, or was actionable upon any ground. *Held,* that, under the Gen. Sts. *c.* 129, §§ 11, 12, the objection that the declaration did not contain sufficient averments that the alleged libel related to the plaintiff, was not open.

A declaration for libel alleged that the defendants, with intent to cause it to be believed that the plaintiff, R. W., a bookseller in Montreal, had attempted to defraud the revenue laws of the United States, and to bring the plaintiff into hatred, contempt and ridicule, published a pamphlet, a copy whereof was annexed to the declaration. The pamphlet, which advocated the substitution of a specific duty for an *ad valorem* duty on imported books, stated that no appraiser could be familiar with the value of different books; that

accordingly English books were entered at the New York custom-house at a nomina.. valuation; that "some bolder spirits, impatient of the chances of detection in our principal ports, devised a simpler plan," of shipping books into Canada and thence introducing them, "through some obscure port of entry on the border, where the ignorance of the officials presumably offered an opportunity of fraud;" that one or two cases would serve to show the *modus operandi* of these transactions; that a Montreal auctioneer, by a prearranged plan, entered a large lot of books at a port of entry on the Canada border under a sworn invoice, on which they were grossly undervalued; and that they were seized by the revenue officers. It continued thus: "A somewhat simi.ar, but smaller transaction recently came to light. A Mr. W., who does a small book business in Montreal, has been in the habit of shipping English books .nto the United States. According to his own statement he received intimations that trouble was in store for him, and accordingly he took the precaution to assemble his principal clerks, in the presence of a witness, and give them the very suggestive instructions, that invoices were thereafter to be made out honestly, both as to prices and contents. Notwithstanding this praiseworthy effort to repress the smuggling instincts of his employés, his very next shipment, consisting of nineteen cases of 'samples,' were seized, on the ground of undervaluation, and because a considerable number of books were not even borne upon the invoices. Mr. W. thereupon, as an injured innocent, complains that he is the victim of a conspiracy set on foot by envious booksellers." *Held*, on demurrer, that the pamphlet was a libel.

TORT for libel. The declaration alleged that the plaintiff was engaged in a large and profitable business, buying and selling books in England, Canada and the United States, and importing books into the United States for sale, and had his regular and usual place of business at Montreal ; that in September 1869 he shipped several cases of books, in the regular course of his business, from Montreal to Boston, without any purpose on his part to evade or defraud the revenue laws of the United States, but intending to use the books as samples of the books which he then had for sale and desired to sell in the United States ; that the goods were seized at St. Albans in Vermont by the revenue officers of the United States, but the officers became satisfied that the plaintiff had no intention to defraud the revenue laws, and released the books without imposing any penalty ; that the defendants, " with intent to cause it to be believed that the plaintiff had attempted to defraud the revenue laws of the United States, and to prevent him from competing with rival booksellers in the United States, and to bring the plaintiff into hatred, contempt and ridicule," did cause to be published and circulated in a pamphlet a false and malicious libel concerning the plaintiff, a copy whereof was annexed to the declaration.

This pamphlet, which was entitled "England's New Colony," and was an argument for the substitution of a specific duty instead of an *ad valorem* duty on imported books, contained the following passage:

" No appraiser can be expected to be familiar with the 4569 different books issued in England last year, or to tell why one volume should be sold for two shillings while another of equal size and appearance should be worth half a guinea. Accordingly for a time the English houses had a full chance at our market. Branches and agencies were established in New York, and as the invoices which passed between them were merely memoranda of shipments and not records of purchase and sale, books were entered at the mere cost of paper and print, or perhaps at any nominal valuation at which it might suit the convenience of parties to pay duties. The effect of this soon began to be felt. The New York booksellers were roused to investigate the matter, and a considerable lot of books were seized for undervaluation. These were consigned by Strahan & Company of London to their New York house at a valuation of £374 8s. 2d., and after their seizure the consignee purchased them back from the custom-house authorities for £492 1s. 9d., that being presumably less than it would have cost his principals to ' duplicate the lot.' At this enforcement of the law, Messrs. Strahan & Company complained loudly and bitterly. In a letter to the London Bookseller of January 31, 1866, they boasted that they could evade our customs regulations by making fictitious sales to an exporting house in London, which then would make another similar sale to their New York branch at an infinitesimal profit, so that the resultant invoice, being the record of an apparent purchase, might safely be sworn to in the American custom-houses. Nay, more, they triumphantly prophesied that in time '·there will no more be an English and American edition of the same book, than there are just now an English and Irish, a French and Belgian, or Prussian and Austrian;' a prophecy which bids fair to be accomplished if our tariff rates remain unaltered, and the comparative cost of production in the two countries continues as at present. The advantages which the Englishman possesses may be judged from th

fact that Mr. Strahan, in a letter to the Bookseller of February 28, 1866, publicly offered to supply at $3\frac{1}{2}d.$ to the American market, 100 or 1000 copies of a book retailing in London for 1s. 6d., which would show, either that the English bookseller rejoices in a rate of profit unknown to his American brethren, or that he is willing to supply us at less than cost, in order to break us down for the purpose of reaping an abundant harvest thereafter.

" To what extent this system of invoicing prevails at the present time, it is, of course, impossible to say. In the vast aggregate of importations through the New York custom-house the appraisers are helpless to detect improper valuations of the endless variety of books which come before them, and only a vigilance committee sitting *en permanence*, and devoting its whole time to the subject, could render error or fraud impossible. Some bolder spirits in the trade, however, impatient of the chances of detection, slender as they might be, in our principal ports, devised a simpler plan which promised larger profits. This was to ship the goods to Canada, and thence introduce them through some obscure port of entry on the border, where the ignorance of the officials, who knew nothing whatever about books, presumably offered an opportunity of fraud sufficient for the wildest ambition. How much of this is habitually done, of course, no one has the means of knowing; but the cumbering of our markets with English books, at prices far below the regular rates of importation, would seem to show that it is largely practised. One or two cases which have accidentally come to light will serve to show the *modus operandi* of these transactions. In 1868 a person named Shaw, a Montreal auctioneer, arranged his plans in England, receiving large consignments from a number of leading houses. These, to the extent of two hundred cases, were shipped to Canada and entered the United States at Port Huron, Michigan, on sworn invoices amounting to $5000. What the real value of the shipment was it is impossible to tell; but it may be guessed at by a few items. Sets of Alison's History of Europe, in full tree calf, worth at wholesale in London $5 per volume, were invoiced at 10 cents. Forty sets of Lodge's Portraits, wholesale London price $400, were entered at $4. Forty sets of Burke's

Works, in full calf, wholesaling at $250, were valued at $4. Seventy copies of the Gallery of Nature, retailing at $10 per copy, were invoiced at $14 the lot, and so on. That the matter had been regularly planned in advance, was shown by the books being divided into lots, marked on the invoices for Cincinnati, St. Louis, Chicago, and Milwaukee, respectively. After being safely entered, the cases were forwarded to their destinations, and but for an accident, the smugglers would have enjoyed in safety the results of their enterprise. In the Cincinnati lot there happened to be a large quantity of English editions of American copyright works, Webster, Irving, Longfellow, &c., which could not legally be introduced into the country. This happened to attract attention, and the holders of the copyrights, on being notified, interfered, leading to an investigation of the transaction and the seizure of the whole consignment. Of course, the English houses who were the sufferers, loudly proclaimed their innocence; but we have as yet heard no satisfactory explanation of the fact that invoices bearing these palpably fraudulent valuations were regularly marked with their places of destination within the United States.

"A somewhat similar, but smaller transaction recently came to light at St. Albans, Vermont. A Mr. Worthington, who does a small book business in Montreal, has been in the habit of shipping English books into the United States. According to his own statement (in a letter addressed to the Boston Daily Advertiser) he received intimations that trouble was in store for him, and accordingly last September he took the precaution to 'assemble his principal clerks,' in the presence of a witness, and give them the very suggestive instructions, that invoices were there after to be made out honestly, both as to prices and contents. Notwithstanding this praiseworthy effort to repress the smuggling instincts of his employés, his very next shipment, consisting of nineteen cases of 'samples,' were seized at St. Albans, Vermont, on the ground of undervaluation, and because a considerable number of books were not even borne upon the invoices. Mr. W. thereupon, as an injured innocent, complains that he is the victim of a conspiracy set on foot by envious booksellers; who on their

part assert that books which they have honestly imported direct from London are unsalable because rival copies are freely offered in the market at less than the original cost of importation.

" These two instances will probably suffice to satisfy our readers that large quantities of English books can be and probably are introduced over the Canada line at rates of duty that deprive the home producer of all his supposed protection."

The defendants demurred, and assigned specially for cause, " that the declaration does not state a legal cause of action substantially in accordance with the rules of law, in this, that it does not set forth anything which is by its natural import libellous or which furnishes legal ground for an action for libel, or is actionable on any ground."

The case was reserved by *Ames*, J., on the demurrer, for the consideration of the full court.

*G. S. Hale*, for the defendants.

*R. M. Morse, Jr., & R. Stone, Jr.*, for the plaintiff.

Morton, J. Our statutes require that a demurrer shall specifically point out the particular in which the alleged defect consists. Gen. Sts. c. 129, §§ 11, 12. Formal errors or defects which are not specifically assigned as causes of demurrer must be deemed to be waived. *Clay* v. *Brigham*, 8 Gray, 161. *Whittemore* v. *Ware*, 101 Mass. 352. In the case at bar the defendants assign as the only cause of demurrer, that the declaration " does not set forth anything which is by its natural import libellous or which furnishes legal ground for an action for libel, or is actionable on any ground." Under this demurrer the objection, argued by the defendants, that the declaration does not contain sufficient averments that the publication declared on related to the plaintiff, is not open to them. If they relied on such formal defect they should have specified it in their demurrer, and if the objection is well founded, it could be obviated by an amendment. The only question before us, therefore, is whether the publication declared on is libellous.

Reading the portions of the publication which relate to the plaintiff, in their connection with the other parts of the article, we think the question is free from difficulty. The obvious import

and intent of the language used is to charge the plaintiff, by insinuation and implication, if not directly, with an attempt to evade and defraud the revenue laws of the United States by making out fraudulent invoices of books imported by him from Canada. Such a charge is libellous. Its inevitable effect is, if believed, to degrade the character of the plaintiff as a merchant and a man. It holds him up to contempt and reproach as wanting in integrity, and tends to injure his character and diminish his reputation. If false it is actionable. *Chenery* v. *Goodrich*, 98 Mass. 224. *Miller* v. *Butler*, 6 Cush. 71.

*Demurrer overruled ; defendants to answer.*